v. Bill Burdett Thank you. May it please the Court, Your Honors. My name is Bill Burdett and I represent the They have filed this lawsuit and this action against the officers and directors of Community Central Bank, a bank that is no longer in existence. Are you reserving rebuttal time? Yes, Your Honor. We're reserving five minutes for rebuttal. Okay. That's fine. Thank you. For three reasons, we believe that the lower court should be reversed. The first is that on the state law claim that was adequately pled for silent fraud, we believe that the lower court improperly applied the Private Securities Litigation Reform Act standards for pleading as opposed to the lesser standards set forth in Rule 9b of the Federal Rules of Civil Procedure. We also believe, though, that the Private Securities Litigation Reform Act was properly pled, that the facts giving rise to this complaint, the facts that we'll get into during this argument, certainly give rise to the fact that there were misleading and false representations made and that the officers and directors acted with adequate scienter. Did you ask that the state can't be dismissed without prejudice? Your Honor, we never had an oral argument. It was dismissed with prejudice. And the lower court, in fact, it was never raised by counsel for the appellees in their motion to dismiss. The lower court, sua sponte, dismissed that claim without any argument or request to do so from the appellees. And that claim... We have to prove for the state count. To prove for that state count is that we have to prove that there was, and this is the Black case that we discussed, that there was actually a material change that made some representation false that had previously been true or at least misleading. And that claim was that this company was well capitalized. They were making that claim through to November 13th of 2009, that this company was well capitalized, which is a term of art. In fact, they then, and during this time, in November and December of 2009, the appellants were signing up their stock subscription agreements. As of December 31st, when the officers and directors signed the subscription agreements, accepting the money, taking it out of escrow, they also took over 60% of the losses for the year that made the company not well capitalized. At the time that they took that, that was a substantial change. The Clement Rowe case that we discussed, it says in Michigan, you actually have to have a change in, you have to disclose the change in circumstances. So it would be like if someone, if we had an agreement to buy a car, and the car actually, at the time of the agreement, like I said, well, I'll buy that car from you. The car was running and was fine. And then from the delivery of the car, there was actually no transmission in the car. The person selling the car has to disclose in the state of Michigan that, hey, by the way, there's no transmission here. There wasn't any transmission in Community Central Bank. In fact, they knew that this company was taking all the losses. They took them all on the same day that they signed the stock subscription agreements. Excuse me, Counselor. You've relied on the Black case, and the Applees have relied on that case as well, it appears. Yes. So both of you seem to be taking the position that that case supports your respective positions. Can you tell me why Applees are wrong in relying on the Black case? Yes. Well, I think the Black case is they actually did indicate in that case there was reliance on assurances that there would be indemnity. And in the Black case, the Michigan Supreme Court reversed and said there had to be a disclosure that that indemnity was not in existence. I believe that the portion of the Black case that the Applees were citing was not complete. And in that, that case indicated that any subsequent financial change of a significant matter, such as taking 60% of your losses for the year that the Community Central Bank did, should be disclosed. There was no such disclosure. It made that claim that they were well capitalized incorrect. Now, I will point out, by the way, that the claim of well capitalization didn't continue, didn't stop just at the third quarter 10-K filings, or the 10-Q filings, I apologize. That also continued on December 16th. The Community Central Bank issued their second supplement to the private placement memorandum where they were offering the stock. In that, they said you need to read this second supplement with the private placement memorandum that was issued in June. That private placement memorandum indicated that they were well capitalized at the time. Fifteen days later, they took 60% of their losses, over $10 million in losses. One was a federal income tax write-off. To say that they didn't know at the time of that second private placement memorandum, when even they're indicating there may be this possibility in the future in their third quarter 10-Qs, is telling. To say that they didn't have any understanding of that, but before they execute that stock subscription agreement on December 31st, on the same day that they're taking all of these massive losses, they should have disclosed that information to these investors, and they didn't. And that constitutes silent fraud under the state of Michigan. And the lower court didn't even analyze whether the specific standards for that. Let me ask you this. The financial information that led to the taking of the losses, wasn't that public information available to your clients, even if the bank hadn't taken the losses at the time of the investment? Wasn't that financial information something that your clients could have looked at as a part of their due diligence of whatever inquiry they were making as they decided whether to make those investments? There was never any indication of that, Your Honor, at the time that they were executing the stock subscription agreements. They were always holding themselves as being well capitalized, that they were acting within the bounds of the law. And, in fact, we know that they weren't, and this is the allegation under the Private Securities Litigation Reform Act. This was a publicly traded company, this bank holding company, wasn't it? Yes, I believe it was, Your Honor. So this financial information should have been disclosed or disclosable to your clients if they had wanted to look at it, wouldn't you say? Well, there wasn't any such disclosures, Your Honor. The indication was only that they would be possibly considering the third quarter report that was issued on November 13, 2009, said there's a possibility of a tax write-off. There was never any indication that that tax write-off was actually going to be such a substantial portion of the losses that led to the downfall of this company. There was also an indication in the private placement memorandum, which was incorporated by reference on December 16th, 15 days before they signed the stock subscription agreement, that they were subject to laws and regulations. They were undertaking to describe that they were, and this is the Kushner case from the Eighth Circuit that we cited, that they were actually complying with the laws. And we know that they weren't. We know that it was false. In February of 2010, the Office of Financial Insurance Regulation issued a report saying, you can no longer do those illegal acts that you were doing. And that is... What about the prior quarterly financial statements, including the last one, before they took the losses? Wouldn't you be able to, your clients, ascertain the company's financial position to some extent from looking at those, and if those raised red flags could have inquired further? Because your clients are sophisticated investors. So are you saying the quarterly filings weren't enough to give them reason to further inquire and to find out some of these problems, even though the losses hadn't been taken yet? That's correct, Your Honor. It's our position that there was not the sufficient information in those quarterly financial documents in order to be able to make that determination. That they withheld this information until the day that they signed the stock subscription agreements, took the clients $1.7 million, and then they said, here is all of the losses that we are describing. But then what you're saying is that the quarterly financial filings, financial information were in compliance with the law and that the position didn't change materially until these losses were taken, which would suggest that maybe they didn't do anything illegal here. Well, the position was, Your Honor, that they were making these representations that they were well capitalized as late as December 16th, 2009. They were incorporating that statement by representation. They recorded the losses 15 days later. That doesn't necessarily mean that the company wasn't undergoing those losses as of December 16th, 2009. They knew that this was going on. It's impossible to look at this and say that they were. What was going on? Your Honor, I mean, it seems like you're saying their filings, their quarterly filings of financial information was in compliance with the law. At least you haven't said that they weren't. Well, our contention is that they were not in compliance with the law because they were not adequately describing the fact that they were not well capitalized. And as of December 16th, they were not well capitalized because on December 31st, they described themselves as only adequately capitalized. It was taken down a notch. They had the motivation to take this money because they were running out of money, and they knew that they had to get this money in, so they led our clients down a primrose path to say, we're fine, we're well capitalized, we're acting within the law, when in fact there was nothing disclosed about the fact that they were under investigation by the Office of Financial Insurance Regulation, which found that they were not acting within the law, which knew that they were not acting consistent with the laws and regulations governing a banking institution. It seemed to me that you interchanged the words subject and compliance at one point, and I'm not sure that that should be the case. My understanding is the plaintiff's argument is that I guess it was misleading or an inaccurate disclosure to say that the defendant was subject to various federal, state, and other laws. And that's factually accurate or legally accurate, isn't that correct? Well, it certainly is to say that yes, everyone is subject to laws. So you interpret subject as to say that they are in compliance with these federal, state, and local governmental laws? I think in making that argument that they need to, they are assuming, or making that statement, they are assuming the burden of saying that yes, we are. Because it is axiomatic, it is given that when someone says, hey, you know what, I'm subject to the laws, it doesn't, you know, that's not to imply that they somehow then have no duty to disclose the fact that they're acting illegally at the same time. Our authorities seem to indicate that making a general statement of legal compliance is not actionable. Well, that's the Indiana pensions case, the pension board case. And that was with regard to Medicare Part D. And in that case, the defendant was making statements that they were reviewing Medicare Part D and that they understood what was going on. And then there was a significant change in the law. And as a result of that significant change in the law, they were somehow held liable. That is a different situation than we have here because there was no significant change in the law. They're indicating and they're undertaking the fact that they have or are subject to these laws. When you make that statement, it's not simply to say that there are laws that exist because everyone understands that. We assume that people know the law and that they are in compliance with it. When an investor is reading that, we need to hold the executives, the officers and directors of the company to a higher standard to say that if you're under investigation and breaking the law at the time, you should be disclosing that. Okay, thank you, Mr. Breda. I appreciate it. Good morning. May it please the Court. My name is Stephen Ribbett. I have the privilege of representing the former officers and directors of Community Central Bank. This Court has the benefit of a very thorough opinion by Judge Murphy below. And you've also had the benefit of full and complete briefing by the parties. So I don't want to regurgitate anything that's in those papers submitted to you, but I do want to highlight a few points. First, just a few words about Community Central Bank so you understand what we're talking about. This is not by any means Chase Bank or Bank of America or anything like that. It's a small regional bank located in Macomb County, Michigan that principally served businesses and communities in the tri-county area around Macomb County. Judge Clay, I know, is familiar with that area, but it shouldn't surprise any of you that this is an area in the region that was particularly devastated by the recession beginning around 2008 and into 2009. In 2009, the bank, the holding company for the bank, and the bank was the holding company's only asset, instituted a series of private placements, which are private offerings, not public stock offerings. It was indeed a publicly held corporation, but this was an effort by the company to raise private capital to shore up its capital reserves in light of the existing and projected weak economic conditions that were facing the region. What is often lost in all this discussion about what it is that the defendant's appellees or the bank should have said are the actual disclosures that the bank, in fact, made. It issued a 23-page private placement memorandum that contained 12 pages of risk disclosures, and these were not generic risk disclosures. These were detailed, comprehensive discussions about all of the challenges that were facing not only the bank and the U.S. economy, but the company specifically and with respect to this particular offering. I won't describe all of the risks that were disclosed in the PPM because it would take up all of my allotted time, but generally potential investors were cautioned and warned that if the risks that were thoroughly disclosed in those PPMs were to materialize, the company, its business, its financial operations, and its viability were very much in doubt. To place this in context, the entire PPM was 23 pages, which means the risk disclosures themselves were more than half of the document, and when you add to that the forward-looking statements and other appropriate pages that were cautioning investors, you have a very detailed discussion of all the risks. It's not possible at all for any investor to have read that document and looked at the public filings of this company, that quarter after quarter showed that the company was losing money and now claim that they were somehow misled as to the financial condition of this company. It was abundantly clear to anyone reading the PPM and those public disclosures that the company was ill. It needed money in order to shore up its capital, which was the entire point of the offering to begin with, and that it faced significant challenges. And as Judge Clay noted, these were accredited investors. These were people who met the sophistication criteria that meant that they were capable of even investing in this offering, and in their application for these shares, they subscribed and they certified that they had read and reviewed the complete PPM and that they were sufficiently aware of the company's business affairs and financial condition. How much did each invest? These are private persons, right? That's correct, Your Honor. Not on a stock exchange. That's correct. How much did each one of them invest? Approximately $250,000 each, I believe. Maybe some did $100,000. They were in blocks and increments of that nature. And did your public offering document didn't have in there that the bank examiners were there and were upset with you? Well, that's not entirely accurate. First of all, Your Honor, in fact, I was going to get to that, but thank you for raising that. The public documents actually did, in fact, disclose that, one, the bank is subject to extensive federal and state regulation, number one, and that it is continuously examined by the bank regulatory authorities. I think the inference that you're being asked to draw on or that the court was being asked to draw on is that  you know, tearing through their, like an IRS audit or something like that. The federal investigators had swarmed in and started conducting this extensive investigation. That's not true. Financial institutions undergo rigorous and continuous regulation by the authorities. Sometimes they find things that need to be corrected. Sometimes they don't. More often they don't. In this time period, there's nothing unusual about that, and that fact that the bank is subject to that kind of regulation was disclosed. And more importantly, what was also— Weren't they making some specific criticisms? I'm sorry? Weren't they making some specific criticisms? Absolutely. After the fact, Your Honor. After these people had already invested, that is correct. And that's the difficulty with their allegations. This entire complaint is really based on fraud by hindsight. It's seizing upon disclosures that were made after the investment and saying that those things must have been known, somehow had to have been known, and should have been disclosed much earlier. But there's no facts to support that inference. And you can't just say, well, because the regulators, three months after the investment, issued a report making certain findings, that somehow these officers and directors— and again, which officer, which director? You know, all of them lumped together. Somehow they had to know what was going to be in a report of the examiners and that there was going to be specific findings. You can't make that prediction. And the law doesn't require us to. And that's the problem with at least that part of the allegation. It's also the problem, frankly, Your Honor, with this whole valuation allowance argument. I was going to ask about that. Yeah, well, what was— It's hard for—I was on board of a little bank, and it's hard to believe they wouldn't have known that that asset was going to be written down fairly soon. Well, here's what they said in the third quarter, first, Your Honor, of 2009. They said, and if you are on the board, then you understand how this works, that the bank made a determination that a valuation allowance was not necessary at that time. They had made that. It's a subjective determination, as the court knows and as the courts have found, that there was no need for a valuation at that time. But they made no guarantee, and this was right in the public fund. There's no guarantee that a valuation allowance might not be required in the future. And if it was required in the future, it could have a material adverse effect on the financial condition of the company. Now, that's three weeks before these people started to invest. That's the disclosure. That's the material fact. The law does not require the bank to go further and make a prediction as to when the valuation allowance might be needed or what the valuation allowance might be. They made a determination it wasn't necessary then. They disclosed the fact it might be required in the future. And when it was determined at the end of the 2009 year that a valuation allowance was necessary, they promptly recorded it when they were supposed to, in the March 31, 2009 10-K, for the financial results of the end of the fourth quarter of 2009 and for the financial results of all of 2009. The difficulty with the appellant's argument, I think, is because they're seizing on the statement that something was recorded as of 12-30-09. The valuation allowance was taken as of 12-31 or 12-30-2009. And they're asking, again, this is another inference, that because it was taken as of that date or recorded as of that date, that means that it was known on that date or shortly before that date. That's not the way financial reporting works in the real world, as the court knows. Financial reporting companies are given three months at the end of the year to review their books, close their books, and make those kinds of accounting determinations. And once they're made, then they have an obligation to timely report it in their 10-K. And that's all that was done. Let me ask you as to the issue of silent fraud. My understanding of the plaintiff's argument is that they say that under the Black case and maybe other Michigan cases that the defendants had a duty to disclose. It may be that they made accurate representations initially, but once new information became known to the defendants, such as the bank going from well-capitalized to adequately capitalized, any other sort of diminution of value or concerns in terms of the company's financials, that the defendants had an obligation under Black and other cases to disclose that to the plaintiffs. And so that by, I guess, about the time that these agreements were signed, the defendants knew that things were going south and had a duty under Michigan law to disclose that. Sure. Thanks. First, one point. I want to make clear because Mr. Burdett suggested that we didn't make that argument to the district court. We did. We argued that all of the fraud claims ought to be dismissed in the lower court, and Judge Murphy agreed. And I think the reason Judge Murphy agreed, Your Honor, and why the silent fraud claim was also dismissed is because ultimately it came down to it whether there was a duty disclosed, whether sufficient facts had been pled to give rise to a duty disclosed on the part of the appellees. And under 9b, applying the common law, or under the PSLR, even the higher standard, Judge Murphy's opinion was they hadn't even met the lower standard. There were no facts pled that would give rise to that duty of disclosure. And it really does tie back to what I was just saying on the valuation allowance and even on the OFER report of examination. These are fraud by hindsight allegations. There are no facts pled in this complaint, in the amended complaint, that could support the claim that the appellees knew any of this prior to the date that the valuation allowance was actually recorded and reported or the OFER report was issued. And so, as Judge Murphy found, and as I would still argue, there was no facts alleged to give rise to the duty disclosed, any of this. Let me ask you this. Since Michigan law is involved in the state count, should that have, under 1367, have been dismissed without prejudice? I don't think so, Your Honor, because again, I think what the trial court was finding was that they hadn't met a sufficient, they hadn't pled sufficient facts to establish a fraud claim, whether it was common law fraud or federal securities fraud. So I thought it was proper for the court to do that. He had discretion, but... He did have discretion, and he exercised his discretion. I don't think it was an abuse of his discretion to do that. What is the difference between silent fraud and just plain old fraud, like somebody who's got termites in their house and doesn't tell people, or got a big crack in their foundation and plastered it up? What's the difference between just... I think it's a distinction between making an affirmative misrepresentation or a fraud of omission. And this whole complaint is... Well, common law addresses, or equity addresses fraud by omission. Yeah, but I think this entire complaint was... Why do we need a separate term for it? I don't know. I don't have the answer for that, Judge Bertelsman. I mean, I think the way this complaint was drafted, it was based on alleged omissions, not actual fraudulent misrepresentations. And their silent fraud count is part of that. I mean, it naturally flows. It's the appropriate count. I don't fault them for... How is it different from just plain old fraud, where somebody... Because you have an affirmative misrepresentation. The elements are slightly different. They don't have to plead and prove an affirmative misrepresentation, just a material omission. It's just a different... There's one less element. The common law addresses that. Never mind. Common law, silent fraud. That's what I was answering. As I understand the plaintiff's claim, it is that there was a material change in the company's financial condition from the time, I guess the third quarter, when it was well capitalized to sometime in December, presumably, right around just before the December 31 agreements were signed, and that the company had an obligation to disclose that to the plaintiffs and did not do so, and that Michigan law imposes such a duty. Right. And, Your Honor, my contention is that there are no facts to establish that there was this material change within the fourth quarter  The obligation to disclose occurs once... What we're talking about is really the valuation allowance. That could be the only thing that we're talking about that would have a financial impact, and that wasn't determined until after the calendar year ended, when the books and records are being closed. It gets reported as of 12-30-09 because that's how they report that. And the first time the defendants had an obligation or the company had an obligation to disclose that fact would have been when it filed its 10-K, as of March 31-09. Now, again, I understand the heightened standards, but we're not talking standards under PSLRA. We're just talking basic pleading facts. There are no facts alleged that support the inference that the defendants knew or should have known or had to have known earlier. There's no facts pleaded. It's all theory. This whole complaint is alleging a theory without facts or basis that's informed by hindsight. And it really does... If you want to get a distinction between this case and all the cases that are relied upon by the appellants, the Frank case, Matrix, Telabs, the difference that you have in every one of those cases, there was a corporate insider or the company itself was making a positive, optimistic statement about its company and its prospects at a time when there were factual allegations of internal reports and other information that showed that those statements were not true. You don't have that here. You don't have a single positive, optimistic statement by anybody in this case, by any of the appellees. All you have are disclosures being very candid about the challenges that were facing this company and how if certain things happened, the company would have serious financial difficulty. Would the plaintiffs have known from the mix of information, publicly or otherwise, that the company had gone from being quote-unquote well-capitalized to adequately... Here's what they would have known, Your Honor. If they had looked at each quarterly filing by the company leading up to 2009, they would see... Because well-capitalized is a regulatory term. It's a term of art. And it's a ratio. And if they had looked, they would have seen the ratio of it being well-capitalized was shrinking quarter by quarter. So that's publicly disclosed. They were still well-capitalized. It's an absolute true statement the bank was well-capitalized. What put them from the well-capitalized into the adequately capitalized, which is the next category lower, is this valuation allowance. So they would have been able to see that, just as they would have been able to see that the company was losing money quarter after quarter. Thank you very much for your time. Thank you. Addressing the silent fraud issue, I think it's important to look at the actual terminology of Rule 9B of the Federal Rules of Civil Procedure. It says that knowledge can be pled generally. The plaintiffs, the crux of the appellee's argument is that there isn't some allegation of specific knowledge with regard to the silent fraud, that these officers and directors did not know in the fourth quarter before signing the stock and subscription agreement that there was going to be a material change. The standard isn't that we have to plead and we pled, that we believe that they knew, generally speaking. That was in the silent fraud count. Say you believe that they know. Is that the same as setting forth facts, alleging actual facts, dates, times, places, whatever that you require? I mean, my understanding is you're saying the plaintiffs just had a belief, a belief based upon just general circumstances involving the company? The fact that between, well, one, there is no requirement that we have to prove that knowledge for silent fraud. At the time of pleading, which is where we're at, we just have to plead that there was knowledge. No plea of particularity at all? No, not with regard to knowledge. With regard to the falsity of the statements, we do, and we pled the falsity of the statements, that the allegation that they were well capitalized as of November 13th when they're issuing their quarterly report for the third quarter, as of December 16th when they're incorporating by reference the private placement memorandum that indicated that they were well capitalized, that the December 16th second supplement specifically says, go back, read our June private placement memorandum. You can still rely on it. That indicated that they were well capitalized. Fifteen days later, we know because of their public filings, they were not well capitalized. Our allegation is it was false when they said that they were well capitalized at the end of the third quarter and on November 13th. Our allegation is it was false when in December 16th they incorporated that statement by reference because they were not well capitalized. They were only adequately capitalized, and that change in a specific term of art was very important to whether or not these investors would have continued investing. The standard in the state of Michigan for silent fraud is that before the transaction is consummated, any subsequently acquired information which he recognizes rendering untrue or misleading previous representations which when made were true or believed to be true. They believed that they were well capitalized at the time, but before consummating that transaction, there was a subsequent massive change. They took all of their losses, they backed them up as far as they could that year so that they could get these plaintiffs' money, $1.7 million into the bank to try and shore up these losses. Had they been disclosing, had they been honest about that disclosure, these investors would not, they relied on this concept that they were well capitalized when in fact they were not. And that is the crux of the silent fraud. Now, we believe that these facts are more than sufficient to also satisfy all the pleading requirements under the Private Securities Litigation Reform Act because they're saying that we are subject to the laws and it is our position that that means that they are in compliance with those laws, that they are not acting illegally, but in fact they were under investigation. And Mr. Ribiot's statement that this was just some sort of standard investigation is without any basis whatsoever. I'm sure that most banks, when they're being reviewed by the FDIC or the Office of Financial and Insurance Regulation, have some sort of, you know, like that it doesn't result in a finding that they're making substandard loans, risky loans, without any basis whatsoever, that they need to get back into compliance with the laws and regulations of the banking industry because they were not. This is to say that, like, the officers and directors had no understanding that this bank was engaging in substandard and risky banking practices that were in violation of the law. That is not an appropriate standard that we want to be imposing on the officers and directors when they're being found that the laws, that they were out of compliance. We know that that statement was false because of the fact that two months later in February, the report of the Office of Financial and Insurance Regulation said it. I also think that it's important to look at the tax valuation. The In re Fannie Mae case, 2008 securities litigation, indicated that the tax valuation write-off which took place after 12 quarters of analysis, where they said that we're going to look at this for three years and then we're going to take this valuation. This bank said, well, we don't think that tax valuation is necessary on November 13, 2009. On December 31, 2009, they took a tax valuation write-off that constituted 40% of their losses for the year. That they didn't know it was necessary at that time constitutes the fraudulent misrepresentation. Thank you. Okay, thank you, Counsel, for your arguments this morning. We appreciate them. The case will be submitted.